THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL GILFORD, Defendant-Appellant.

First District (3rd Division)   No. 1—01—0695

Opinion filed December 24, 2002.

724

Thomas M. Breen & Associates, of Chicago (Thomas M. Breen, Paul C. Gridelli, and Todd S. Pugh, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Peter Fischer, and Mary L. Boland, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HALL delivered the opinion of the court:

On December 16, 1997, following a jury trial, defendant Michael Gilford was convicted of two counts of criminal sexual assault and two counts of criminal sexual abuse of T.A. Defendant filed a timely post-trial motion, which was denied. On February 23, 1998, defendant was sentenced to two consecutive 30-year terms of imprisonment. On March 16, 1998, defendant filed a timely motion to reduce his sentence, which was subsequently denied. Defendant then filed a timely notice of appeal on March 27, 1998.

On June 30, 1999, on direct appeal, this court reversed defendant's convictions and remanded the action for retrial. *People v. Gilford*, No. 1—98—1346 (1999) (unpublished order under Supreme Court Rule 23 (166 Ill. 2d R. 23)). We found that the State's evidence was sufficient

to find defendant guilty of criminal sexual assault and criminal sexual abuse beyond a reasonable doubt. We also found, however, that certain trial court errors denied defendant a fair trial and needed to be cured upon remand. This court indicated that upon remand: (1) defendant was entitled to have his own expert physically examine T.A. in order to determine whether her physical disability[1] affected her ability to move her head and neck; (2) the trial court should not unduly limit defendant's cross-examination of Doctor Rom-Rymer, the State's expert witness; and (3) if the trial court's *in camera* review of T.A.'s psychological records revealed that the records contained no exculpatory material, the trial court should impound the records and preserve them for appellate review.

The matter was remanded to the trial court by mandate issued on January 4, 2000. Defendant made his $250,000 bail bond. On May 4, 2000, after discovery had been tendered and a number of continuances granted, the State sought to revoke defendant's bond on the basis that defendant had violated the conditions of the bond by being found on school grounds. Defense counsel argued that defendant was on the school's grounds because he had driven to the school to pick up his wife, who was employed as a nurse at the school. The trial court subsequently rejected the State's argument that the bond should be revoked and instead modified the conditions of the bond and put defendant on 24-hour home confinement with the exception that defendant could see his attorney, attend church and attend court-ordered counseling, if he gave 24-hour advanced notice to pretrial services. The trial court set the trial date for July 2000 but reset it to August 14, 2000, due to witness unavailability.

On June 23, 2000, approximately two months before defendant's criminal trial was to begin, the State filed a civil commitment petition to have defendant declared a sexually dangerous person as that term is defined in section 1.01 of the Illinois Sexually Dangerous Persons Act (the Act) (725 ILCS 205/1.01 (West 1996)).[2] On August 7, 2000, the trial court denied defendant's motion to dismiss the State's petition and instead directed that pursuant to section 4 of the Act

---

[1]The record indicates that T.A. was wheelchair-bound due to spina bifida.
[2]Section 1.01 of the Act defines sexually dangerous persons as follows:

"All persons suffering from a mental disorder, which mental disorder has existed for a period of not less than one year, immediately prior to the filing of the petition hereinafter provided for, coupled with criminal propensities to the commission of sex offenses, and who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children, are hereby declared sexually dangerous persons." 725 ILCS 205/1.01 (West 1996).

defendant be examined by two qualified psychiatrists in order to ascertain if he was sexually dangerous.[3]

At the hearing on the State's petition, conducted in December 2000, the State presented the testimony of Dr. Mathew S. Markos, a psychiatrist at the Forensic Clinical Services of the circuit court of Cook County, Dr. Roger M. Wilson, a psychiatrist at the Isaac Ray Center, a part of Rush-Presbyterian-St. Luke's Medical Center in Chicago, Illinois, and Dr. Orest E. Wasyliw, a forensic psychologist at the Isaac Ray Center. The parties stipulated that the doctors were experts in their respective fields.

At the hearing, Dr. Markos testified that he examined defendant on August 29 and 30 of 2000. The purpose of the first examination was to determine if defendant suffered from any specific mental disorder that had lasted for at least one year and that may have increased defendant's propensity for criminal sexual behavior toward children and others. Prior to examining defendant, Dr. Markos reviewed the following documents: (1) the State's petition; (2) the transcripts related to this court's Rule 23 order dated June 30, 1999, regarding defendant's sexual conduct with T.A.; (3) police and investigative reports pertaining to defendant's sexual misconduct with J.G. as well as Melissa K.[4] and T.A.; and (4) Department of Children and Family Services records pertaining to defendant. Dr. Markos also reviewed a report of an incident wherein defendant allegedly sexually molested Danielle H., a 15-year-old babysitter, who babysat for defendant and his wife's two children.

Dr. Markos' second examination was devoted to an evaluation of defendant's psychosexual development. During this second examination, Dr. Markos obtained information regarding defendant's sexual history, starting with his sexual development. The doctor investigated defendant's sexual behavior and fantasies, both normal and deviant.

---

In comparison, a sexually violent person is defined in section 5(f) of the Sexually Violent Persons Commitment Act (725 ILCS 207/5(f) (West 2000)).

[3]Section 4 of the Act requires the trial court to appoint two qualified psychiatrists to personally examine the defendant to determine if he is sexually dangerous. 725 ILCS 205/4 (West 1996). The examining psychiatrists must then file a report with the court containing the results of their examination.

[4]The record indicates that J.G. was between the ages of four and eight when the sexual abuse occurred and that the abuse occurred from approximately 1983 to 1988. Melissa K. was 10 years old at the time defendant sexually abused her.

Based on the two independent examinations, Dr. Markos opined that defendant was suffering from the mental disorder of pedophilia, which the doctor believed had existed for a period of not less than one year. Dr. Markos further opined that defendant's pedophilia was predominantly directed toward young females and was coupled with the criminal propensity to the commission of sex offenses. Dr. Markos went on to state that, in his opinion, defendant met the statutory criteria of a sexually dangerous person.

On cross-examination, Dr. Markos testified that he was aware that after defendant's convictions for engaging in sexual misconduct with J.G. and Melissa K., defendant had received treatment and therapy. The doctor testified, however, that in his opinion even though defendant received therapy, and even though there had been no reports of repeat sexual misconduct by defendant subsequent to the therapy he received, these factors alone did not indicate that the therapy was successful. Dr. Markos testified that, in his opinion, defendant still had pedophilic impulses of which he had not been cured. Dr. Markos conceded that his opinion regarding defendant's present propensity to commit further sexual offenses was based on defendant's pedophilic behavior that occurred more than 10 years ago.

Dr. Wilson testified that he evaluated defendant in August 2000. Prior to examining defendant, Dr. Wilson reviewed the same documents that Dr. Markos had reviewed in preparation for his examination of defendant. Dr. Wilson testified that his evaluation of defendant began with a clinical interview wherein he asked defendant to discuss his sexual history and previous sexual conduct. During the interview, defendant admitted that in addition to sexually molesting J.G. and Melissa K., he also molested his young son during the same period. Dr. Wilson testified that when he asked defendant if this type of conduct might occur again, defendant replied, "I don't know if this will happen again. Like alcohol, you must always be aware." On cross-examination, Dr. Wilson testified that pedophilia is a mental disorder that, like alcoholism, is a life-long illness that cannot be cured. The doctor agreed that an individual who was diagnosed as a pedophile some 10 years earlier would always have a propensity to commit that type of behavior again. The doctor explained that a pedophile is never cured, but, rather, the possible recidivism can be reduced.

Dr. Wilson testified that after he conducted his clinical interview of defendant, a forensic nurse gave defendant an "Abel questionnaire" to evaluate his sexual interests; defendant then underwent an "Abel Screening," which visually assessed his sexual interests; defendant was also tested by a device called a plethysmograph, which measured the changes in the circumference of defendant's penis in response to

22 audiovisual videotapes; defendant also underwent a "Q-Sort" test wherein he viewed various pictures of adult men and women and young boys and girls.

On the "Abel questionnaire" defendant scored 32; a score of 23 or less would be a deviation from the norm. On the sexual cognitive distortion and immaturity test, defendant scored 2 out of 20; a score of 3 or less suggests few if any cognitive distortion problems. The "Abel Screening" showed that defendant had an interest in adult females with a slightly higher interest in adolescent females. The "Abel Screening" also indicated that defendant appeared to be interested in adult males, frotteurism involving adult females and exhibitionism involving adult females.

On cross-examination, Dr. Wilson testified that the indication of frotteurism was not derived from any documented behavior, but from defendant's fantasies and urges. However, Dr. Wilson conceded that defendant did not tell him about any fantasies that specifically indicated frotteurism. Dr. Wilson testified that the indication of exhibitionism was not derived from any documented behavior, but from the amount of time defendant spent viewing a specific picture during the "Abel Screening" assessment. The results from the plethysmograph were equivocal, with defendant showing some responsiveness to underage females in coercive and noncoercive situations. On the "Q-Sort" test, defendant showed a moderate interest in adult women and adolescent girls.

Based on defendant's self-reports of child sexual abuse, police records, and the data that Dr. Wilson collected from the tests defendant underwent, the doctor opined that defendant was suffering from the mental disorder of paraphilia with features of pedophilia, ephebophilia, exhibitionism, frotteurism, and sadism. Dr. Wilson believed that defendant's mental disorder had existed for not less than one year. Dr. Wilson further opined that defendant continued to possess a criminal propensity to engage in criminal sexual behavior toward minors, adolescents and adults. Dr. Wilson went on to state that, in his opinion, defendant was a sexually dangerous person from a clinical standpoint. In addition, the doctor opined that the therapy defendant had received did not reduce the possibility of recidivism.

On cross-examination, Dr. Wilson testified that in rendering his opinion he took into consideration defendant's 1997 conviction of the criminal sexual assault and criminal sexual abuse of T.A. The doctor conceded that he did not know that defendant's 1997 conviction had been reversed and remanded. On re-cross-examination, when asked for evidence of defendant's inability to control himself in the past 10 years, Dr. Wilson pointed to the incident where defendant was found

on school grounds and on the number of extramarital affairs defendant had engaged in.

Dr. Wasyliw testified that he conducted a psychological evaluation of defendant on August 22, 2000. Prior to examining defendant, Dr. Wasyliw reviewed the same documents that Dr. Markos had reviewed in preparation for his examination of defendant. Dr. Wasyliw evaluated defendant in order to assess the presence, nature and extent of any psychopathology related to defendant's criminal sexual behavior. Dr. Wasyliw testified that his evaluation of defendant began with a clinical interview wherein he asked defendant to discuss his sexual history and previous sexual conduct. Dr. Wasyliw testified that after he interviewed defendant, he conducted a series of tests on defendant, which included the Shipley Institute of Living test (an IQ test), the Minnesota Multiphasic Personalty Inventory test (MMPI-2), the Millon Clinical Multiaxial Inventory-II test, the 16-Pesonality Factor Questionnaire and the Rorschach Psychodiagnostic test.

Based on the results of these five tests, Dr. Wasyliw opined that defendant was suffering from the mental disorder of paraphilia with features of pedophilia and ephebophilia. Dr. Wasyliw also opined that defendant was suffering from a personality disorder having histrionic and narcissistic features. The doctor testified that the combination of these two personality traits indicated that defendant was a very self-centered, self-indulgent and manipulative individual, who was ready and willing to use others for his own purposes.

Dr. Wasyliw testified that in his opinion the previous therapy that defendant received had no substantive effect on his pedophilia. The doctor opined that it was likely that defendant would continue to have sexual interests in both young adolescents and prepubescent children. Dr. Wasyliw found no indications of frotteurism or exhibitionism.

On cross-examination, Dr. Wasyliw conceded that the five tests he administered to defendant could not predict defendant's propensity to engage in future sexual misconduct since the tests were not designed for that purpose. The doctor testified that in his opinion even though defendant received therapy and even though there had been no reports of repeat sexual misconduct by defendant subsequent to the therapy he received, these factors alone did not indicate that the therapy was successful.

The parties then stipulated to the testimony of State witnesses J.G., Melissa K., Danielle H., and T.A., who would all recount their inappropriate sexual encounters with defendant. The parties further stipulated that defense witness Officer Batko would testify consistent with his testimony heard on December 12, 1997. The trial court

reversed itself and struck the testimony of Dr. John Grant.[5] The State then rested.

Defendant renewed his motion to dismiss the State's petition. Upon denial of the motion, defendant rested without presenting evidence. After hearing closing arguments on the matter, the trial court found that defendant was a sexually dangerous person and consequently remanded him to the custody of the Illinois Department of Corrections. Defendant filed a timely notice of appeal, and we granted his application for direct appellate review.

On appeal, defendant contends that: (1) the Act is unconstitutional; (2) the trial court erred in finding the evidence sufficient to declare him a sexually dangerous person beyond a reasonable doubt; and (3) the State improperly used the Act for retribution when, during the pendency of defendant's criminal proceeding, the State elected to seek defendant's commitment as a sexually dangerous person under the Act, rather than proceed with the pending criminal prosecution. For the reasons that follow, we vacate and remand with directions.

## ANALYSIS

Defendant first contends that the Act is unconstitutional and violates his substantive due process rights in light of the United States Supreme Court's decisions in *Kansas v. Hendricks*, 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997), and *Kansas v. Crane*, 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002), because the Act allows a defendant to be indeterminately committed as a sexually dangerous person without proof that the defendant's mental disorder makes it "seriously difficult" for the defendant to control his behavior. Defendant claims that a mental disorder affecting an individual's propensity to commit sex offenses, as the Act requires, does not equate to a mental disorder that causes serious difficulty in controlling behavior, as *Crane* requires.

In response, the State contends that the Act meets the standards announced in *Hendricks* and *Crane* because it requires a defendant's mental illness to exist for at least one year, it links that mental illness to criminal sexual propensities and then requires defendant to have

---

[5]At the criminal trial, Dr. Grant gave testimony regarding T.A.'s physical disabilities and opined as to what she could not do physically. This court ruled that upon retrial, Dr. Grant could only give such testimony if T.A. consented to a physical examination performed by a doctor retained by the defendant. When the case was back before the trial court, all parties acknowledged that, due to the passage of time and due to the fact that T.A.'s physical disorder was progressive, a physical examination would not reveal what her physical capabilities were at the time the offense occurred.

actually demonstrated these propensities. The State maintains that a defendant's demonstrated sexual propensities are proof, in and of themselves, that the defendant has serious difficulty controlling his behavior.

■ The constitutionality of a statute is a question of law which this court reviews *de novo*. *People v. Malchow*, 193 Ill. 2d 413, 418, 739 N.E.2d 433 (2000). In addition, statutes carry a strong presumption of constitutionality and the party challenging the constitutionality of a statute bears the burden of rebutting this presumption. *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 377, 689 N.E.2d 1057 (1997). The starting point for any due process analysis is the selection of the proper test to be applied when reviewing the alleged constitutional violation. *In re I.D.*, 205 Ill. App. 3d 543, 548-49, 563 N.E.2d 1200 (1990).

In the present case, the State maintains that the Act is subject to the rational basis test because the statute is not based on a suspect classification and it does not implicate a fundamental right. We must reject the State's argument on this issue.

■ Generally, courts apply the rational basis test in examining the constitutionality of a statute under substantive due process. *Tully v. Edgar*, 171 Ill. 2d 297, 304, 664 N.E.2d 43 (1996). To satisfy this test, a statute need only bear a rational relation to a legitimate legislative purpose and be neither arbitrary nor discriminatory. *Tully*, 171 Ill. 2d at 304. If, however, the challenged legislation impinges upon a fundamental constitutional right, the court will examine the statute under the strict scrutiny standard. *Tully*, 171 Ill. 2d at 304. Under the strict scrutiny standard, a statute violates substantive due process unless it is narrowly tailored to serve a legitimate and compelling legislative interest. *Tully*, 171 Ill. 2d at 304-05.

■ Both the Illinois and United States Constitutions protect individuals from deprivations of liberty without due process of law. U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 2. The due process clause "includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.' " *Troxel v. Granville*, 530 U.S. 57, 65, 147 L. Ed. 2d 49, 56, 120 S. Ct. 2054, 2059-60 (2000), quoting *Washington v. Glucksberg*, 521 U.S. 702, 720, 138 L. Ed. 2d 772, 787, 117 S. Ct. 2258, 2267 (1997). The right involved in this case is freedom from physical restraint, a fundamental right. *Foucha v. Louisiana*, 504 U.S. 71, 80, 118 L. Ed. 2d 437, 448, 112 S. Ct. 1780, 1785 (1992). The right to be free from physical restraint is a fundamental right at stake in a civil commitment proceeding. *In re Linehan*, 594 N.W.2d 867, 872 (Minn. 1999); *In re Dutil*, 437 Mass. 9, 13, 768 N.E.2d 1055, 1061 (2002). Therefore, we hold that the Act is subject to strict scrutiny.

The decisions in *People v. Pembrock*, 62 Ill. 2d 317, 342 N.E.2d 28 (1976), *People v. McDougle*, 303 Ill. App. 3d 509, 708 N.E.2d 482 (1999), *People v. McVeay*, 302 Ill. App. 3d 960, 706 N.E.2d 539 (1999), and *In re Detention of Samuelson*, 189 Ill. 2d 548, 727 N.E.2d 228 (2000), do not support the State's argument that the rational basis test should be used in examining the constitutionality of the Act, because these decisions pertain to whether the statutory classifications created by the Act and the Illinois Sexually Violent Persons Commitment Act violate equal protection. The level of scrutiny applied in reviewing legislative classifications under the equal protection guarantee depends upon the nature of the classification. *In re R.C.*, 195 Ill. 2d 291, 309, 745 N.E.2d 1233 (2001). For example, classifications based upon race or national origin, or affecting fundamental rights, receive a heightened level of review under the strict scrutiny standard, while economic and social welfare legislation is reviewed under the deferential rational basis test. *In re A.A.*, 181 Ill. 2d 32, 37, 690 N.E.2d 980 (1998). The Act does not discriminate against members of a suspect class but the statute does affect a fundamental right. The decisions in *Pembrock, McDougle, McVeay*, and *In re Detention of Samuelson* do not address, in a due process analysis, a defendant's fundamental right to freedom from physical restraint at stake in a civil commitment proceeding under the Act.

■ As previously mentioned, under strict scrutiny, challenged legislation must be narrowly tailored to serve a legitimate and compelling legislative interest. *Tully*, 171 Ill. 2d at 304-05. The State has set forth two legitimate and compelling interests supporting the Act. See *People v. Trainor*, 196 Ill. 2d 318, 323-34, 752 N.E.2d 1055 (2001) (declaring that the purpose of the Act is twofold: "(1) to protect the public by sequestering a sexually dangerous person until such time as the individual is recovered and released, and (2) to subject sexually dangerous persons to treatment such that the individual may recover from the propensity to commit sexual offenses and be rehabilitated"); *Addington v. Texas*, 441 U.S. 418, 426, 60 L. Ed. 2d 323, 331, 99 S. Ct. 1804, 1809 (1979) (finding that states have a legitimate and compelling interest in both protecting the public from sexual violence and rehabilitating the mentally ill). Therefore, the constitutionality of the Act turns on whether the State has demonstrated that the statute is narrowly tailored to serve the two legitimate and compelling interests of protecting the public from sexual violence and rehabilitating the mentally ill.

The determination of whether the Act is narrowly tailored enough to achieve its two legitimate and compelling interests depends upon whether the statute distinguishes "the dangerous sexual offender

whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." *Crane*, 534 U.S. at 413, 151 L. Ed. 2d at 863, 122 S. Ct. at 870. There is a risk that any convicted sex offender will reoffend upon being released from prison; civil commitment, however, is limited to the individual whose current mental disorder makes it seriously difficult for him to control his dangerous sexual behavior. *Crane*, 534 U.S. at 413, 151 L. Ed. 2d at 862, 122 S. Ct. at 870. Therefore, the Act is constitutional and is narrowly tailored to achieve its two legitimate and compelling interests of ensuring public safety from sexual assaults and providing care and treatment of the mentally disordered, if the statute targets only those individuals whose current mental disorder makes it seriously difficult for them to control their dangerous sexual behavior. Based upon the following analysis, we conclude that the Act is constitutional.

Prior to *Crane*, the case that had been the standard for determining the constitutionality of a civil commitment statute for sexual offenders was *Hendricks*. In *Hendricks*, the United States Supreme Court upheld the constitutionality of a Kansas civil commitment statute for sex offenders that required that the person was " 'likely to engage in *** predatory acts of sexual violence.' " *Hendricks*, 521 U.S. at 352, 138 L. Ed. 2d at 509, 117 S. Ct. at 2077, citing Kan. Stat. Ann. § 59—29a02(a) (1994). The Court stated, "[t]he statute thus requires proof of more than a mere predisposition to violence; rather, it requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated." *Hendricks*, 521 U.S. at 357-58, 138 L. Ed. 2d at 512, 117 S. Ct. at 2080. In *Hendricks*, the Court concluded that the Kansas statute complied with substantive due process because it "requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior." *Hendricks*, 521 U.S. at 358, 138 L. Ed. 2d at 512-13, 117 S. Ct. at 2080, citing Kan. Stat. Ann. § 59—29a02(b) (1994). The Court emphasized that Hendricks' diagnosis as a pedophile and his admitted lack of volitional control, coupled with predictions by mental health professionals of his future dangerousness, "adequately distinguish[ ] Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." *Hendricks*, 521 U.S. at 360, 138 L. Ed. 2d at 514, 117 S. Ct. at 2081.

The Supreme Court reaffirmed and clarified its *Hendricks* decision in *Crane*. In *Crane*, unlike *Hendricks*, there was no evidence in the

record suggesting that Crane was unable to control his behavior. *Crane*, 534 U.S. at 417, 151 L. Ed. 2d at 865, 122 S. Ct. at 872 (Scalia, J., dissenting). Therefore, the Supreme Court in *Crane* examined the requirement established in *Hendricks* that the person be unable to control his behavior, stating, *"Hendricks* underscored the constitutional importance of distinguishing a dangerous sexual offender subject to civil commitment 'from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.' " *Crane*, 534 U.S. at 412, 151 L. Ed. 2d at 862, 122 S. Ct. at 870, quoting *Hendricks*, 521 U.S. at 360, 138 L. Ed. 2d at 501, 117 S. Ct. at 2081. One requirement that helps make that distinction, the Court noted, was that the person must manifest "a special and serious lack of ability to control behavior." *Crane*, 534 U.S. at 413, 151 L. Ed. 2d at 862, 122 S. Ct. at 870. The Court required "that there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish" the dangerous sexual offender subject to civil commitment from the dangerous but typical recidivist. *Crane*, 534 U.S. at 413, 151 L. Ed. 2d at 862-63, 122 S. Ct. at 870. The Court, however, pointing to the ever-advancing science of psychiatry, declined to establish a precise standard for determining the extent to which a sex offender must lack control before he may be found to have serious difficulty in controlling his behavior, thereby giving each state leeway to make that determination through an interpretation of its own statute. *Crane*, 534 U.S. at 413, 151 L. Ed. 2d at 863, 122 S. Ct. at 871.

■ Statutes are presumed constitutional and any doubts must be resolved in favor of the validity of the law in question. *People v. Falbe*, 189 Ill. 2d 635, 639, 727 N.E.2d 200 (2000). When interpreting a statute, this court's primary objective is to ascertain and give effect to the intent of the legislature. *Barnett v. Zion Park District*, 171 Ill. 2d 378, 388-89, 665 N.E.2d 808 (1996). When determining legislative intent, the court must construe the language of the statute according to its plain and ordinary meaning. *In re C.M.*, 282 Ill. App. 3d 990, 996, 669 N.E.2d 707 (1996). If the statutory language is clear and unambiguous, the statute's plain meaning will be given effect. *People v. Whitney*, 188 Ill. 2d 91, 97, 720 N.E.2d 225 (1999). A statute is ambiguous if it is capable of more than one reasonable interpretation. *Paciga v. Property Tax Appeal Board*, 322 Ill. App. 3d 157, 161, 749 N.E.2d 1072 (2001). The language in section 1.01 of the Act regarding the definition of a sexually dangerous person is capable of only one reasonable interpretation and, thus, is unambiguous.

■ In the instant case, defendant contends that the Act is

unconstitutional because section 1.01 of the statute, pertaining to the definition of a sexually dangerous person, does not use the language found in *Crane* regarding the requirement of serious difficulty in controlling behavior. Specifically, defendant maintains that an individual who has a propensity to commit sexual offenses under the Act is not equivalent to a person who has serious difficulty in controlling behavior as required in *Crane*. Defendant contends that an individual possessing criminal sexual propensities may still be able to control his conduct, and therefore, the Act does not provide a meaningful standard by which the class of civil committees can be distinguished from pure recidivists. We must reject defendant's contention.

The language in the Act distinguishes the dangerous sexual offender subject to civil commitment from the typical recidivist. Section 1.01 of the Act defines a sexually dangerous person as a person suffering from a mental disorder, which has existed for at least one year prior to the filing of the petition, and who has demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children. 725 ILCS 205/1.01 (West 1996). Thus, the Act applies only if a person has already engaged in a course of harmful sexual conduct and has suffered for over at least a year from a mental disorder, such as pedophilia, which explains and helps predict that person's future dangerousness. The Act requires that the future danger posed by an individual be linked to a mental disorder that affects the person's ability to control his dangerous sexual conduct and that the individual have actually demonstrated an inability to control this conduct. See *People v. Allen*, 107 Ill. 2d 91, 105, 481 N.E.2d 690 (1985) (stating that the Act requires the State, not to just give proof of mere "propensity," but to prove that defendant has demonstrated his propensity by "at least one act of or attempt at sexual assault or sexual molestation"). A person who has a mental disorder that causes him to actually carry out his criminal sexual propensities or inclinations is a person who has serious difficulty controlling his behavior. The language of the Act implicitly requires a finding of serious difficulty in controlling behavior. See, *e.g.*, *In re Detention of Wilber W.*, 53 P.3d 1145, 1149 (Ariz. App. 2002) (concluding that Arizona's sexually violent persons act is constitutional under *Crane*, where the language in the statute implicitly requires a finding of serious difficulty in controlling behavior). The Act's precommitment requirements—that a person is subject to the statute only if he suffers from a long-term mental disorder affecting his ability to control his conduct and has actually demonstrated an inability to control his dangerous sexual conduct— sufficiently narrows the class of persons eligible for civil commitment to those persons who have serious difficulty controlling their behavior. Consequently, we hold that the Act is constitutional.

Defendant next contends that the State failed to prove that he was a sexually dangerous person beyond a reasonable doubt. Specifically, defendant asserts that, at the time of trial, the State failed to prove beyond a reasonable doubt that he held criminal propensities to commit sex offenses or that he lacked the ability to control his criminal conduct. Defendant maintains that because he has not been charged with committing any sexual crimes against children since 1990, this is evidence that he no longer has criminal propensities to commit sex offenses and evidence that he has the ability to control his conduct.

■ A trial court's determination that an individual is a sexually dangerous person under the Act will be upheld on appeal unless the evidence is so improbable that there remains a reasonable doubt. *People v. Cole*, 299 Ill. App. 3d 229, 234, 701 N.E.2d 821 (1998). The question on review is whether, after viewing all the evidence in the light most favorable to the State, any rational trier of fact could find that the elements of the offense have been proved beyond a reasonable doubt. *In re Detention of Tittlebach*, 324 Ill. App. 3d 6, 11, 754 N.E.2d 484 (2001).

■ Pursuant to *Crane*, lack of control is a constitutionally required element of a cause of action under the Act. See, *e.g.*, *In re Martinelli*, 649 N.W.2d 886, 890 (Minn. App. 2002) (stating that under *Crane*, it is essential that there be a judicial finding of lack of control based on expert testimony tying that lack of control to a properly diagnosed mental abnormality before civil commitment may occur). The State must demonstrate that on the date of the hearing defendant had serious difficulty (lacked control) in controlling his criminal sexual behavior. See *People v. Bailey*, 265 Ill. App. 3d 758, 762-63, 639 N.E.2d 1313 (1994) (concluding that a trial court must determine whether an individual is currently a sexually dangerous person on the date of its decision).

■ In the present case, the trial court did not have the benefit of *Crane* when it issued its commitment order; thus, the court never made a lack-of-control determination as required by *Crane*. The State contends, however, that defendant's diagnosis of paraphilia amply meets the "serious difficulty" requirement under *Crane*; and at oral argument, the State contended that defendant's diagnosis as a pedophile necessarily implies that he lacks volitional capacity such that he has serious difficulty in controlling his behavior. We cannot agree with the State's contentions. In the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), the authority relied upon by the State-appointed clinicians in this case, the manual cautions:

"[T]he fact that an individual's presentation meets the criteria for a DSM-IV diagnosis does not carry any necessary implication

regarding the individual's degree of control over the behaviors that may be associated with the disorder. Even when diminished control over one's behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a particular individual is (or was) unable to control his or her behavior at a particular time." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR*, at xxxiii (4th rev. ed. 2000).

This introductory commentary in the DSM-IV indicates that defendant's diagnosis as a pedophile does not necessarily imply that he lacks volitional capacity such that he has serious difficulty in controlling his behavior. Consequently, the judgment of the trial court must be vacated and remanded with directions to determine whether defendant's mental condition causes him to have serious difficulty in controlling his criminal sexual behavior. The "serious difficulty" finding required by the State's petition should be made by the trial court, which is in a superior position to hear the expert testimony, weigh the evidence, and decide if defendant's diagnosed mental abnormality makes it seriously difficult for him to control his behavior to justify civil commitment under the Act. See, *e.g.*, *In re Spink*, 112 Wash. App. 287, 290, 48 P.3d 381, 382 (2002) (reversing and remanding for new trial where there was no finding regarding defendant's ability to control his behavior); *In re Commitment of W.Z.*, 173 N.J. 109, 133-34, 801 A.2d 205, 219 (2002) (remanding for a determination of whether defendant's mental condition caused the required degree of inability to control his sexually violent behavior).

■ Defendant next contends that the State improperly used the Act for retribution when, during the pendency of defendant's criminal proceeding, the State elected to seek defendant's commitment as a sexually dangerous person under the Act, rather than proceed with the pending criminal prosecution. We must reject defendant's contention for two reasons. First, our supreme court has concluded that the Act "does not promote traditional aims of punishment, such as retribution or deterrence. Rather, under the Act, the State has a statutory obligation to provide care and treatment for persons adjudged sexually dangerous." *Trainor*, 196 Ill. 2d at 325. Second, the State had the discretion to seek defendant's commitment as a sexually dangerous person under the Act, since criminal charges were pending against defendant when the State filed its commitment petition. *People v. Patch*, 9 Ill. App. 3d 134, 138, 293 N.E.2d 661 (1972); *People v. Burkhart*, 116 Ill. App. 3d 708, 712, 452 N.E.2d 375 (1983) (concluding

that commitment order entered pursuant to section 3 of the Act[6] was proper where there were five criminal charges pending against defendant when the trial court pronounced defendant to be a sexually dangerous person). Therefore, we find that the State did not abuse its discretion when it elected to seek defendant's commitment as a sexually dangerous person under the Act, rather than proceed with the pending criminal prosecution.

Defendant, in his opening appellate brief, claimed that the State failed to prove that Dr. Markos was a "qualified psychiatrist" under the Act. However, in defendant's reply brief he concedes that Dr. Markos was qualified. Consequently, defendant withdrew the issue for consideration by this court.

Accordingly, for the foregoing reasons, the judgment of the circuit court of Cook County is vacated and the cause is remanded with directions to determine if defendant's diagnosed mental condition makes it seriously difficult for him to control his criminal sexual behavior, thereby justifying civil commitment under the Act. If the circuit court determines that defendant's mental condition makes it seriously difficult for him to control his behavior, then defendant's conviction should be reinstated. If, however, the circuit court determines that defendant's mental condition does not make it seriously difficult for him to control his behavior, then defendant should be released. The record of the new hearing is to be filed with this court and the parties are allowed to fully brief the issues.

Vacated and remanded with directions.

SOUTH, P.J., and WOLFSON, J., concur.

---

[6]Section 3 of the Act provides for the initiation of a civil commitment proceeding. This section states:

"When any person is charged with a criminal offense and it shall appear to the Attorney General or to the State's Attorney of the county wherein such person is so charged, that such person is a sexually dangerous person, within the meaning of this Act, then the Attorney General or State's Attorney of such county may file with the clerk of the court in the same proceeding wherein such person stands charged with criminal offense, a petition in writing setting forth facts tending to show that the person named is a sexually dangerous person." 725 ILCS 205/3 (West 1996).