98 P.3d 1206 (2004)
122 Wash.App. 660
In re the DETENTION OF Michael Allen HALGREN, Appellant.
No. 50192-5-I.
Court of Appeals of Washington, Division 1.
July 26, 2004.
As Changed and Publication Granted September 23, 2004.
*1208 Nancy P. Collins, WA Appellate Project, Seattle, WA, for Appellant.
Brooke E. Burbank, David J.W. Hackett, Carla B. Carlstrom, Jeffrey C. Dernbach, King Co. Prosecutors Office, Seattle, WA, for Respondent.
COX, C.J.
The "beyond a reasonable doubt" standard specified in RCW 71.09.060(1), which partially describes the requirements of a civil commitment trial under the Sexually Violent Predator Act ("SVPA"), reflects the legislative intent that jury verdicts in such trials must be unanimous.[1] A Petrich[2] instruction is required *1209 when the State presents evidence of several acts that could form the basis of one charged count and fails to inform the jury of its election to rely on a specific act to support the charge.[3] Because examination of the statutory definition of sexually violent predator ("SVP") in RCW 71.09.020(16) makes clear that mental illness, whether it is defined as "mental abnormality" or "personality disorder," is a critical element in determining whether one is an SVP, we reject Michael Halgren's attempt to apply the Petrich rule here. The trial court properly exercised its discretion in declining to give such an instruction where evidence in the record indicated that Halgren suffered from a "mental abnormality" and a "personality disorder." We affirm.
Prior to his release from prison for an unlawful imprisonment conviction, the State filed a petition pursuant to RCW 71.09 alleging that Halgren was an SVP. The petition was based on the predicate offense of his 1989 first degree rape conviction.
Prior to trial, and over Halgren's objection, the trial court granted the State's motion for a CR 35 mental examination in September 2001. Over Halgren's objections under Frye,[4] ER 702, ER 703, and ER 403, the trial court also admitted testimony concerning risk prediction actuarial instruments and the results of a penile plethysmograph test ("PPG").
During trial, the State's expert, Dr. Robert Wheeler, testified that Halgren had the mental disorder of paraphilia NOS rape and anti-social personality disorder. Wheeler testified that the combination of paraphilia and antisocial personality disorder caused Halgren serious difficulty controlling his behavior. In contrast, Halgren's expert, Dr. Theodore Donaldson, testified that Halgren did not have a mental disorder and did not presently have a personality disorder.
At the close of the trial, Halgren requested a Petrich instruction. His argument was based on the theory that evidence of both a mental abnormality as well as a personality disorder was before the jury. He argued that the jury verdict must be unanimous as to which of these two mental conditions applied to Halgren. The trial court refused to give the requested instruction.
The trial court also instructed the jury that it must consider less restrictive alternatives to total confinement, but that the court had no authority to order such conditions.[5]
The jury returned a verdict that Halgren is an SVP, and Halgren appeals.
We stayed this matter pending our supreme court's decision in Thorell.

UNANIMITY INSTRUCTION
Halgren contends that the trial court's refusal to give a unanimity instruction that required the jury to determine whether he suffered from either a "mental abnormality" or a "personality disorder" was an abuse of discretion. We hold that the court properly exercised its discretion because a Petrich instruction is not required as to which of these two mental illnesses underlies a determination that one is an SVP.
RCW 71.09.060(1) specifies a "beyond a reasonable doubt" standard that reflects the legislative intent that jury verdicts in commitment trials under the SVPA must be unanimous.[6] A Petrich instruction is required when the State presents evidence of several acts that could form the basis of one charged count and it fails to inform the jury of its election to rely on a specific act to support the charge.[7] Where neither alternative is followed, a constitutional error arises stemming from the possibility that some jurors may have relied on one act while other jurors relied on another, resulting in a lack of unanimity on all elements necessary for a conviction.[8]
*1210 Whether a statute describes a single offense committable in more than one way or describes multiple offenses is a question of legislative intent.[9] When the statute, on its face, does not clearly indicate legislative intent, we may determine that intent by applying several factors.[10] The factors include (1) the title of the act; (2) whether there is a readily perceivable connection between the various acts set forth; (3) whether the acts are consistent with and not repugnant to each other; (4) and whether the acts may inhere in the same transaction.[11] We review a trial court's decision to refuse a party's jury instruction for an abuse of discretion.[12]
An SVP is "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility."[13] RCW 71.09.060(1) specifies, "[t]he court or jury shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator."
Halgren does not contend that the jury failed to conclude unanimously that he is an SVP. Rather, he argues that a Petrich instruction was required to ensure that the jury was unanimous on which of two mental illnesses  "mental abnormality" or "personality disorder"  was the one from which he suffers. This argument is unsupported by controlling authority, and we reject it.
We first note that there is evidence in the record, which if believed, satisfied both of the two statutory criteria. Nevertheless, Halgren questions whether the record supported the diagnoses concluding that he suffered from both conditions. We need only point to the testimony of Dr. Wheeler to address this point.
Dr. Wheeler testified:
I've diagnosed [Halgren] with two major mental disorders, paraphilia NOS, nonconsenting persons, and antisocial personality disorder. Those are separate diagnoses, but obviously they interact in the same individual.
In Mr. Halgren's case, his recurrent, intense sexual fantasies and urges and behaviors related to sexually assaulting sexually mature females by definition create an emotional pull to engage in the behavior. By definition, they predispose the person to engage in those behaviors ...
So essentially, think of him as having this mental disorder that creates a pull to engage in sex with nonconsenting women. And then you ask, well, what facilitates or what deters that?
In Mr. Halgren's case, his antisocial personality disorder tells you that this is not an individual who is deterred from engaging in a behavior that he obviously knows is wrong and illegal and harmful.
... This is a man who doesn't have empathy or remorse for other people in the way that would operate as a deterrent against acting on these urges and fantasies that he has.

So the combination of those two things, the paraphilia and the antisocial personality disorder, in combination cause him serious difficulty in controlling his urges and to engage in sexual assault.[14]
Halgren also contends that the diagnosis of paraphilia NOS rape or nonconsent is a controversial diagnosis of dubious psychological value. He also argues that the expert witnesses disagreed as to whether he suffered from a personality disorder. But it is unclear how these contentions support an argument in favor of a unanimity instruction. To the extent Halgren disagreed with Dr. Wheeler's diagnoses, he placed this disagreement before the jury during cross-examination and with the testimony of his own expert. The fact that the experts disagreed on Halgren's clinical diagnosis is not a proper *1211 basis for his conclusion that a unanimity instruction is constitutionally required here.
We also note that Halgren's attempt to apply Petrich to this situation ignores the obvious distinction between "acts" and diagnoses of "mental illness." Specifically, in order to commit an individual to confinement and treatment, the State must prove either a "mental abnormality" or a "personality disorder," both of which are mental illnesses that render a person likely to engage in predatory acts of sexual violence. Indeed, for due process purposes, our supreme court has already established that "the civil commitment of an SVP satisfies due process if the SVP statute couples proof of dangerousness with proof of an additional element, such as `mental illness,' because the additional element limits confinement to those who suffer from an impairment `rendering them dangerous beyond their control.'"[15]
Here, the question is whether to apply Petrich to a commitment trial under the SVPA and require an instruction requiring a jury to agree that a respondent suffers from either a "mental abnormality" or a "personality disorder." To answer that question we apply the criteria in an analogous context outlined in Arndt.[16]
First, the title of the act, "Sexually Violent Predators," does not aid in the determination of whether the legislature intended the "mental abnormality" or "personality disorder" distinction in the definition of an SVP to be two distinct means of satisfying the requirements of chapter 71.09 RCW.
Second, we determine whether there is a readily perceivable connection between the various acts, or, in this case, mental illnesses, set forth in the SVP definition. There is. The result to be accomplished here is the samecommitment as an SVPwhether one has a mental abnormality or personality disorder, or both. The SVPA lists these closely related and connected aspects of mental illness that are predicates to the single status of SVP for which civil commitment is required.[17]
Third, we determine whether the mental illness diagnoses are consistent with and not repugnant to each other. They "are not repugnant to each other unless the proof of one will disprove the other."[18] Clearly, one can be diagnosed with a personality disorder without disproving a mental abnormality, and vice-versa. "Personality disorder" and "mental abnormality" are not repugnant to each other.
Finally, we address whether both categories of mental illness may inhere in the same transaction. There is no inherent distinction between being unable to control one's behavior because of a "mental abnormality" or because of a "personality disorder," or because of both. Significantly, one is not committed twice as an SVP if they have both a mental abnormality and personality disorder.
Applying the factors discussed in Arndt, we conclude that chapter 71.09 RCW, by analogy, defines two means"mental abnormality" or "personality disorder"of a single mental illness status. When that status is coupled with the other statutory criterion, proof of dangerousness, civil commitment as an SVP is required. Consequently, the trial court properly exercised its discretion when it declined to give the requested Petrich instruction.
We note that the facts of this case illustrate why, at a fundamental level, Halgren's contention is erroneous. Here, the State's expert, who the jury obviously believed over Halgren's expert, testified that both disorders, paraphilia n.o.s. nonconsent and anti-social personality disorder, caused Halgren's volitional control issues. To force the State to elect or the jury to rely on only one, either the mental abnormality or the personality disorder, would unnecessarily introduce a requirement *1212 that is not present in the statute. It would also compromise the value of the clinical judgments of expert witnesses in this difficult area. Neither the constitution nor the statute requires this.
The State contends that Petrich does not apply simply because a proceeding under the SVPA is "civil." We summarily reject this view.
The supreme court long ago announced that jury unanimity on the question of whether one is an SVP was required because of the legislative use of the more demanding criminal standard, beyond a reasonable doubt.[19] In doing so, it nevertheless classified the SVPA as civil.[20] Thus, the classification of the statute as civil does nothing to answer the more specific question whether certain criminal law standards are applicable within the act.[21] Accordingly, the State's characterization of these proceedings as "civil" is not useful in answering the specific question before us.
In sum, there is no persuasive support for the proposition that a Petrich instruction of the type sought here is required. Accordingly, the trial court did not abuse its discretion in refusing such an instruction.
Halgren also contends that the trial court abused its discretion when it granted the State's request for a CR 35 mental examination and when it admitted expert testimony concerning actuarial instruments and the results of a PPG. Finally, he argues that the trial court violated his due process rights when it gave an erroneous "less restrictive alternative" instruction. The trial court did not abuse its discretion in any respect and did not violate any due process right of Halgren when it gave an instruction directed by then-existing case authority from our state supreme court.

CR 35 MENTAL EXAMINATION
Halgren contends that the trial court abused its discretion by granting the State's discovery request for a CR 35 mental examination. We hold that the trial court did not abuse its discretion because the law at the time of the State's motion permitted the use of CR 35 in a civil commitment proceeding under chapter 71.09 RCW.
CR 35 provides:
When the mental ... condition ... of a party ... is in controversy, the court in which the action is pending may order the party to submit to a ... mental examination by a physician or psychologist.... The order may be made only on motion for good cause shown and upon notice to the person to be examined....
This court reviews discovery rulings for an abuse of discretion.[22]
Our supreme court recently held that the use of CR 35 to compel a mental examination during pretrial discovery is inconsistent with civil commitment proceedings under chapter 71.09 RCW.[23] But this court in In re Detention of Smith[24] concluded that the trial court in that case did not abuse its discretion by ordering a CR 35 mental examination of a sex offender in a civil commitment proceeding pursuant to chapter 71.09 RCW because the law at the time of trial permitted the use of CR 35 to compel a mental examination.[25]
That rule applies here. This court had published Williams in May 2001 concluding, "[t]here is nothing in RCW 71.09 that would *1213 prevent additional discovery beyond that required by statute, including a CR 35 psychological examination."[26] The State moved in September 2001 for a CR 35 mental examination. Thus, the law at the time of the motion supported the State's motion
Subsequently, in October 2002, our supreme court concluded that the use of CR 35 in civil commitments under chapter 71.09 RCW was inappropriate. We conclude that the trial court did not abuse its discretion when it granted the State's motion for a CR 35 mental examination in September 2001.

ACTUARIAL EVIDENCE
Halgren contends that the trial court abused its discretion by admitting expert testimony concerning actuarial tests under ER 702 and ER 403.[27] We disagree.
"Actuarial approaches use statistical analysis to identify a number of risk factors that assist in the prediction of future dangerousness."[28] Because actuarial models are based on analysis of small samples, they have potential predictive shortcomings.[29] "[A]ctuarial assessments may be admitted to show the likelihood of reoffense."[30] This court analyzes them for admissibility under ER 702 and ER 703.[31]
ER 702 provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Under ER 702, questions related to reliability may be considered by the court under the "helpfulness to the jury" standard of admissibility.[32] Admissibility of expert testimony under ER 702 is within the trial court's discretion.[33]
ER 403 provides that relevant evidence may be excluded if the probative value is substantially outweighed by the danger of prejudice or confusion. A decision on the admissibility of evidence is within the discretion of the trial court and this court will not reverse the trial court's decision absent an abuse of discretion.[34]
The trial court ruled the actuarial evidence admissible under ER 702 and ER 403, concluding that "[t]he jury will be able to understand the weaknesses in the logic [of actuarial instruments], the strong points and the weak points. It's all going to be there on display for them to evaluate and make of [it] what they will." This ruling was entirely proper.
Halgren's arguments concerning the reliability of the instruments go to their weight, not their admissibility.[35] And the record illustrates that Halgren challenged the reliability of the actuarial instruments at trial, subjected the State's expert to rigorous cross-examination, and presented his own expert testimony on the reliability of the instruments.
In short, Halgren fails to present an argument concerning the admissibility of the actuarial instruments that our supreme court did not already dispose of in Thorell. We conclude that the trial court did not abuse its discretion by admitting this evidence.

PENILE PLETHYSMOGRAPH TEST
Halgren contends that the trial court abused its discretion when it admitted expert testimony concerning the results of a PPG *1214 test without a Frye hearing or ER 702 or ER 703 analysis. This argument is not persuasive.
"A plethysmograph measures sexual arousal by means of an electronic recording device attached to the penis of the person being tested. The recording device monitors the subject's responses to the viewing of slides of naked women and children of various ages involved in various types of sexual activity."[36] PPG testing yields information on the sexual arousal patterns of sex offenders that is useful in assessing baseline arousal patterns and therapeutic progress.[37] PPG testing is "an effective method for diagnosing and treating sex offenders."[38]
We review de novo the admissibility of evidence under the Frye test.[39] Under that test, novel scientific evidence is admissible only if it is generally accepted in the relevant scientific community.[40] Such evidence is not admissible if there is a significant dispute among qualified experts as to its reliability.[41] If the evidence does not involve new methods of proof or new scientific principles, then the Frye test is not necessary.[42]
Expert opinion based on data interpreted by another is admissible when certain requirements of ER 703 are met.[43] ER 703 provides:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
We review for abuse of discretion the court's decision to admit expert testimony.[44]
Halgren does not contend that the PPG is not generally accepted in the scientific community, under Frye, as a diagnostic and treatment tool for sex offenders.[45] To the extent he may be attempting to argue this, he has made no showing that the PPG is not generally used in the scientific community for diagnosis and treatment. Furthermore, there is no indication that the PPG involves new methods of proof or novel scientific principles.
Instead, Halgren argues only that the PPG is not generally accepted in the scientific community as a tool to predict a sex offender's likelihood to reoffend. The State's expert agreed.[46]
But the results of the PPG, standing alone, were never offered or admitted. Rather, the State offered the PPG results under ER 703 through the testimony of Dr. Wheeler as one of several bases concerning his comprehensive sex offender evaluation that informed his opinion on Halgren's risk to reoffend.
To the extent Halgren claims that Dr. Wheeler testified that the PPG alone revealed that Halgren was at a risk to reoffend, he mischaracterizes the doctor's testimony. Dr. Wheeler testified that the results of Halgren's PPG indicated that he was twice as aroused by depictions of violent rape as by *1215 consenting sexual behavior. Dr. Wheeler testified that the PPG can be used to measure sexual deviancy. He also testified that Halgren's past behaviors were a strong indicator of sexual deviancy, including his long history of rape fantasies and raperelated behaviors and the fact that he also engaged in voyeurism, exhibitionism, and obscene phone calling. Dr. Wheeler stated that when he correlated the PPG result with Halgren's psychopathy rating as measured by the Psychopathy ChecklistRevised, he could better assess Halgren's risk to reoffend.
Dr. Wheeler acknowledged on cross-examination that there is limited evidence that the PPG itself predicts recidivism. He noted that the PPG is but one variable that mental health professional use in concert with other factors to predict recidivism, but that the PPG itself is not a predictor of future behavior.[47]
Halgren's contention that the trial court did not engage in ER 702 or ER 703 analysis is at odds with the record. The trial court concluded that the proposed testimony met the requirements of both ER 702 and ER 703 because it "is potentially of value to the jury." The trial court further noted that it did not find the evidence presented any prejudice that would not be outweighed by its relevance and helpfulness to the jury, satisfying the requirements of ER 403.
Furthermore, Halgren's contention that the PPG is unreliable goes to the weight and not the admissibility of the evidence.[48]
Halgren's reliance on Parker, a child custody case, is misplaced. Parker does not hold, as Halgren asserts, that the PPG is not admissible to predict a person's likelihood of future sex offenses. Moreover, it expressly acknowledges that the use of the device with respect to convicted sex offenders has been permitted.[49] For the same reason, Halgren's reliance on In re Marriage of Ricketts,[50] another child custody case that relies on Parker, is similarly misplaced.[51]
We conclude that the trial court did not abuse its discretion when it declined to hold a Frye hearing and when it admitted expert testimony concerning Halgren's PPG that was but one factor on which Dr. Wheeler relied to inform a comprehensive clinical assessment of Halgren's risk to reoffend.

LESS RESTRICTIVE ALTERNATIVE INSTRUCTION
Halgren contends that the LRA instruction violated his due process rights because the language informing the jury that the court had no authority to direct his release to an LRA was unnecessary and undermined consideration of the relevant issues. We disagree.
Our supreme court's recent decision in Thorell overruled the law on LRA instructions applicable at the time of Halgren's commitment hearing under Brooks. Brooks held
... it is a violation of the equal protection clauses of the federal and state constitutions for LRAs to confinement under chapter 71.09 RCW to be considered only after a person petitions for release from confinement whereas under chapter 71.05 RCW LRAs to confinement are considered at the probable cause hearing and commitment trial.[52]
The Brooks court concluded,
[t]he court or jury may hear evidence concerning LRAs and may determine whether treatment in an LRA is in the best interest of the alleged SVP. If, however, the court or jury determines that he should be released to an LRA, the court has no power *1216 to order placement in an LRA. See Laws of 2001, ch. 286, § 8
...
The State is entitled, however, to an instruction which informs the jury the court has no authority to order the defendant into an LRA or to undergo treatment in an LRA. The State may not argue, and is not entitled to an instruction, to the effect that no LRA can exist because the court has no power to order such placement and treatment.[53]
The current rule under Thorell is that "... those who meet the statutory definition and are committed as SVPs are not entitled to consideration of LRAs until their first annual review."[54]
The LRA instruction given by the court in this case stated:
If you find that the Respondent is a sexually violent predator, then you must determine whether the State has also proved beyond a reasonable doubt that release of the Respondent on a less restrictive alternative to total confinement is (a) not in the best interests of the Respondent or (b) would not adequately protect the community.
You are not being asked to determine specific conditions of release that would adequately protect the community because the Court does not have the authority to direct his release on such conditions at this time.
Halgren acknowledges that under the reasoning in Thorell, he is not now entitled to an LRA instruction. Nevertheless, he contends, without citing persuasive authority, that the emphasized language violates his due process rights by distracting the jury from a relevant legal issue. Speculation alone is insufficient to support this claim and we do not find it persuasive.
Halgren also contends that the emphasized language discourages the jury from finding an LRA viable because the jury will not impose a condition that the court has no authority to order. But Brooks envisioned precisely the jury instruction that the court issued in this case. And Halgren cites no authority to support his contention that the language used was erroneous.
Furthermore, although Halgren argues that the jury was likely to reject an LRA because of the subject language, he offers nothing that is persuasive to demonstrate that the jury did so in this case. Significantly, Halgren fails to cite to any evidence in the record either that he qualified for an LRA, or that the language in the instruction unduly influenced the jury.
There was no due process violation arising from the instruction the court gave under the law that was applicable at the time.
We affirm the order of commitment.
SCHINDLER and GROSSE, JJ., concur.
NOTES
[1] In re Detention of Young, 122 Wash.2d 1, 48, 857 P.2d 989 (1993).
[2] State v. Petrich, 101 Wash.2d 566, 572, 683 P.2d 173 (1984).
[3] State v. Kitchen, 110 Wash.2d 403, 409, 756 P.2d 105 (1988).
[4] Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (App.D.C.Cir.1923).
[5] See In re Detention of Brooks, 145 Wash.2d 275, 36 P.3d 1034 (2001), overruled in part by, In re Detention of Thorell, 149 Wash.2d 724, 751, 72 P.3d 708 (2003), cert. denied, ___ U.S. ___, 124 S.Ct. 2015, 158 L.Ed.2d 496 (2004).
[6] Young, 122 Wash.2d at 48, 857 P.2d 989.
[7] Kitchen, 110 Wash.2d at 409, 756 P.2d 105.
[8] Kitchen, 110 Wash.2d at 411, 756 P.2d 105.
[9] State v. Arndt, 87 Wash.2d 374, 378, 553 P.2d 1328 (1976).
[10] Arndt, 87 Wash.2d at 378-79, 553 P.2d 1328.
[11] Arndt, 87 Wash.2d at 379, 553 P.2d 1328.
[12] State v. Picard, 90 Wash.App. 890, 902, 954 P.2d 336, review denied, 136 Wash.2d 1021, 969 P.2d 1065 (1998).
[13] RCW 71.09.020(16) (emphasis added).
[14] Report of Proceedings on February 13, 2002, at 87-88 (emphasis added).
[15] Thorell, 149 Wash.2d at 731-32, 72 P.3d 708 (citing Kansas v. Hendricks, 521 U.S. 346, 358, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)) (emphasis added).
[16] An alternative analysis was proposed by Division II of this court in State v. Hanson, 59 Wash.App. 651, 656-56, 800 P.2d 1124 (1990).
[17] See Arndt, 87 Wash.2d at 382, 553 P.2d 1328 ("... RCW 74.08.331 lists closely related, connected acts which constitute the single offense of fraudulently obtaining public assistance to which one is not entitled.").
[18] Arndt, 87 Wash.2d at 383, 553 P.2d 1328 (quoting State v. Pettit, 74 Wash. 510, 518-19, 133 P. 1014 (1913)).
[19] Young, 122 Wash.2d at 48, 857 P.2d 989.
[20] Young, 122 Wash.2d at 23, 857 P.2d 989.
[21] In re Detention of Skinner, 122 Wash.App. 620, 628-629, 94 P.3d 981 (2004) (burden of proof beyond a reasonable doubt standard applies to motion for a judgment as a matter of law under former RCW 71.09.094(1)).
[22] John Doe v. Puget Sound Blood Ctr., 117 Wash.2d 772, 777, 819 P.2d 370 (1991).
[23] In re Detention of Williams, 147 Wash.2d 476, 491, 55 P.3d 597 (2002) ("The statute expressly provides for postcommitment evaluation, but it makes no mention of evaluations during pretrial discovery. CR 35 is inconsistent with the special proceedings set out in chapter 71.09 RCW. We hold that the mental examination by the State's experts of a person not yet determined to be a sexually violent predator is limited to the evaluation required under RCW 71.09.040(4).").
[24] 117 Wash.App. 611, 72 P.3d 186 (2003).
[25] Smith, 117 Wash.App. at 617, 72 P.3d 186 (citing In re Detention of Williams, 106 Wash.App. 85, 22 P.3d 283 (2001), aff'd in part, rev'd in part, 147 Wash.2d 476, 55 P.3d 597 (2002)).
[26] Williams, 106 Wash.App. at 94, 22 P.3d 283.
[27] Halgren properly concedes that Thorell disposes of his argument that the trial court erred by failing to analyze the admissibility of the instruments under Frye or Daubert.
[28] Thorell, 149 Wash.2d at 753, 72 P.3d 708.
[29] Thorell, 149 Wash.2d at 753, 72 P.3d 708.
[30] Thorell, 149 Wash.2d at 766, 72 P.3d 708.
[31] Thorell, 149 Wash.2d at 754-55, 72 P.3d 708.
[32] State v. Copeland, 130 Wash.2d 244, 270, 922 P.2d 1304 (1996); State v. Janes, 121 Wash.2d 220, 235-36, 850 P.2d 495 (1993).
[33] State v. Cheatam, 150 Wash.2d 626, 645, 81 P.3d 830 (2003) (citation omitted).
[34] Cox v. Spangler, 141 Wash.2d 431, 439, 5 P.3d 1265 (2000).
[35] Thorell, 149 Wash.2d at 756, 72 P.3d 708 (citing In re Detention of Campbell, 139 Wash.2d 341, 358, 986 P.2d 771 (1999)).
[36] In re Marriage of Parker, 91 Wash.App. 219, 222, 957 P.2d 256 (1998) (citation omitted).
[37] State v. Riles, 135 Wash.2d 326, 344, 957 P.2d 655 (1998).
[38] Riles, 135 Wash.2d at 343-44, 957 P.2d 655.
[39] Copeland, 130 Wash.2d at 261, 922 P.2d 1304.
[40] Copeland, 130 Wash.2d at 255, 922 P.2d 1304.
[41] Copeland, 130 Wash.2d at 255, 922 P.2d 1304.
[42] State v. Ortiz, 119 Wash.2d 294, 311, 831 P.2d 1060 (1992).
[43] State v. Nation, 110 Wash.App. 651, 662, 41 P.3d 1204 (2002), review denied, 148 Wash.2d 1001, 60 P.3d 1212 (2003) (citation omitted).
[44] Nation, 110 Wash.App. at 661, 41 P.3d 1204 (citation omitted).
[45] See e.g., Riles, 135 Wash.2d at 344, 957 P.2d 655 ("[PPG] is an essential technology in the assessment and treatment of the sexual aggressor."); WAC 246-930-310(7)(c) ("The use of physiological assessment measures, such as penile plethysmography, may yield useful information regarding the sexual arousal patterns of sex offenders. This data can be useful in assessing baseline arousal patterns and therapeutic progress.").
[46] Report of Proceeding on February 14, 2002, at 39-40 ("There's limited evidence that phallometric, penile plethysmograph, assessments predict recidivism ... taken as only one variable, the score on the phallometric test, that doesn't predict recidivism.").
[47] ("The fact that it [the PPG] shows us which rapists have a preferential of arousal to rape doesn't automatically mean it correlates to recidivism, correct. But ... if you combine it with these other risk factors, it does indeed help you predict recidivism.").
[48] Thorell, 149 Wash.2d at 756, 72 P.3d 708 (citation omitted).
[49] Parker, 91 Wash.App. at 225-226, 957 P.2d 256.
[50] 111 Wash.App. 168, 43 P.3d 1258 (2002).
[51] Ricketts held only "that the trial court abused its discretion by ordering the father to submit to a plethysmograph examination where the record reveals no finding of a compelling interest that outweighs the father's liberty interest." Ricketts, 111 Wash.App. at 173, 43 P.3d 1258.
[52] Brooks, 145 Wash.2d at 286, 36 P.3d 1034.
[53] Brooks, 145 Wash.2d at 292-93, 36 P.3d 1034.
[54] Thorell, 149 Wash.2d at 751, 72 P.3d 708.